MEMORANDUM OF DECISION
On February 2, 1998, the Department of Children and Families, hereafter "DCF", filed a petition for the termination of the parental rights of Lisa R. to her two children, Alicia and Justin R. Alicia is now twelve years old and Justin is eight. Justin's father is unknown and Alicia's putative father was only recently identified as William M. No men claiming to be their biological fathers have ever been involved in the lives of these two children and Lisa has stated that when Justin was conceived, she CT Page 13592 was engaged in prostitution to earn money to feed Alicia. On January 10, 1995, both children disclosed sexual abuse by their mother to a therapist at the Child Guidance Clinic, where they had been seem intermittently since 1991. DCF invoked a ninety-six hour hold and the children were placed in foster care. On December 18, 1995, both were adjudicated neglected children and committed to the care and custody of DCF. Their commitments have been extended twice since that time.
In the termination petitions, DCF alleges that Alicia and Justin were previously adjudicated neglected and that their mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives. Also alleged is that Lisa R. has committed acts of omission and commission in that the children have been denied the care, guidance, or control necessary for their physical, educational, moral or emotional well being. Connecticut General Statutes § 17a-112(c)(3)(B) and (C). The amendment to the petition naming William M. as the putative father of Alicia, was granted on August 12, 1998, after publication of notice to him at his last known address. After trial and evidence concerning this putative's father abandonment of the child, the court permitted an amendment of the pleadings to allege abandonment and to conform the pleadings to the proof.
Trial commenced on November 2, 1998 and concluded on November 4, 1998. Nine witnesses testified. Lisa R. and her counsel attended the trial and contested the claims made by DCF. The court received sixteen exhibits. From the evidence, the court finds the following facts:
 A. FACTS
Lisa R., now age thirty-seven, has had a difficult life. She was herself placed in foster care as an infant and adopted at age one. There are reports of emotional and behavioral difficulties beginning at age eight. Lisa reports sexual abuse by her brother and rape as an young adolescent. Lisa suffers from Fetal Alcohol Syndrome and possesses the distinctive facial abnormalities of the disorder and the "congenital neuro-cognitive impairment in her ability to organize events and its impact on the higher cognitive functions such as anticipating and making connections between events."[2] Her adolescence was fraught with CT Page 13593 complications and included two hospitalizations, one at age fifteen in a hospital for socially and emotionally disturbed children and then, for a period of three years, at the Yale Psychiatric Institute. Since she was sixteen, Lisa has been receiving Social Security Disability Income. Because of her condition and abilities, Lisa has only had marginal employment on an intermittent basis during her life. As a young woman, she continued to act in socially inappropriate ways and in 1992, she was incarcerated for two years for larceny and assaulting a police officer.
On February 2, 1986, Alicia was born and four years later, Lisa gave birth to her second child, Justin. DCF became involved with the family in 1991, when Lisa's boyfriend, Andre D., was arrested and subsequently convicted of sexually abusing Alicia. By March, 1994, DCF had opened a protective services case because of reports that Lisa has physically disciplined her children in inappropriate ways. In the fall of 1994, Lisa herself reported that she could not care for her daughter Alicia and she arranged for her to live with friends, Mr. and Mrs. T., during the week and only saw Alicia on the weekends. Whatever respite having Alicia live with others might have provided her mother was short-lived. By January 10, 1995, Lisa attempted to cut her own wrists and threatened to drive herself and the children into a river. Her threats came after Alicia began to disclose sexual abuse by her mother in the presence of the DCF social worker and Mrs. T., where she was living. During the emergency evaluation of the children at the Child Guidance Clinic on that date in 1995, where they had been seen on occasion since 1991, both of the children disclosed sexual abuse by their mother. Alicia disclosed, the therapist treating her at the Clinic testified, that her mother had pinched and licked her breasts and had used a dog leash on her, abuse that Andre D., the boyfriend who has sexually molested Alicia, also inflicted on her. Justin disclosed on that date that his mother hit his penis with a brown paddle, that he had seen his mother's vagina and that she had put her vagina against his butt and that his feet had been burned by his mother with a cigarette lighter. He also said that she hit him hard on the thighs, knees and butt so that they were red and he could not sit down. He stated that she had inserted a safety pin in his rectum several times.
Both children were removed from their mother and placed in foster care on January 10, 1995. They have not been with their mother nor seen her since that date, because of the no-contact CT Page 13594 orders issued in the criminal prosecution of Lisa for her acts. Lisa R. was charged with several counts of risk of injury to a minor child. On July 21, 1997, she was convicted of the charges and sentenced to five years of imprisonment, suspended after nine months. Further court orders prohibit contact with children under the age of eighteen, her own children and their foster parents. These no-contact orders will expire on April 9, 2003, according to Lisa's probation officer, Natalie Travers, who has been seeing Lisa since her release from York Correctional Facility in April, 1998.
Both Helen Pinsky, the children's therapist at the Child Guidance Clinic from 1993 to 1998, as well as the DCF caseworker, Deborah Bell, testified to the tremendous progress both children have made since their removal from their mother and their placement in foster care. Alicia, in 1995, Ms. Pinsky testified, was depressed. She had flashbacks and nightmares about telling about the abuse. She was afraid either her mother or her mother's former boyfriend would take her away and she might be killed. Alicia suffered from deficient social skills and had developmental delays. An evaluation was performed to secure necessary services for Alicia at school. Since that time, Alicia has both received and benefited from those services. Ms. Pinsky testified that, at the time of the conclusion of her therapy in March of 1998, Alicia was able to think clearly and concisely and she had a positive outlook for the future. She was developmentally on target, she had age-appropriate hobbies and interests and she was doing well academically. She stated that the child was engaged in a reciprocal relationship with her in therapy and with the foster parents. She stated Alicia was able to use these sessions and exchange with others in real on-going conversations, which she had not been capable of doing in 1995. Ms. Pinsky stated that Alicia was assertive, showed a full range of emotions, sadness and anger, and was interested in teen things such a roller-skating, swimming, her own hygiene and physical appearance.
After a short period of time in foster care elsewhere in 1995, while their household was being specially licensed, Alicia returned to the care of Mr. and Mrs. T., where she had lived prior to her formal removal from her mother. She remains there today and the family wishes to adopt her. While the caseworker testified that Alicia has the normal episodes of rebellion there, she wishes to remain there and considers her foster parents her family. She would like to be adopted by them, although she does CT Page 13595 show some ambivalence about this, as she remembers her mother and her family of origin. Alicia is very clear that she does not want to see her mother. She is angry at her mother and believes that she should be punished for the terrible things she did to her and her brother, Justin. A letter expressing her sentiments addressed to the judge sentencing Lisa R. in 1997 was an exhibit before the court. At her request, assisted by her counsel and approved as therapeutically appropriate by Ms. Pinsky, Alicia requested permission to speak to the court. By agreement, Alicia, her foster parents and her counsel, the court as well as counsel for the mother met in chambers for Alicia to present her position, which was consistent with her views in 1997. A letter stating her point of view, in case she was not permitted her meeting, also was admitted as an exhibit after the court's in-chambers conference with Alicia.[3]
Justin's situation has also dramatically improved. When Ms. Pinsky first saw him and in his first foster home, he exhibited very disturbed and aggressive behavior, choking an infant there, hitting the foster mother, taking the belongings of others and urinating indiscriminately. She said it appeared his was a case of psychosis. In particular, she referenced his self-image, which was severely disturbed. He drew a picture of himself, she said with earrings on, indicated that he would develop a vagina and then his name would be changed to Justina. He had, she stated "no body boundaries and his body drawing was very fragmented."
In March, 1996, Justin was removed from his first foster home and placed with Mr. and Mrs. E., relatives of the family. There have been remarkable changes in the child's behavior since that time. He has stabilized there, and is happy in this home. Since being with them, he has felt able to disclose and discuss in therapy with Ms. Pinsky much of the abuse his mother inflicted on him. His sense of himself as a young boy has also been integrated and he has an awareness of himself and the necessary boundaries he must maintain. The extent of the abuse both children suffered, however, Ms. Pinsky, stated, is something that will never be known in full as "there are many more things that have occurred than they choose to share with us."
The extent of Lisa's sexual dysfunction and her serious issues with her proclivities to sexual abuse are illustrated not only by the difficulties with her treatment, but also by events which have occurred since she has been released from incarceration and placed on probation. Prior to her CT Page 13596 incarceration, in 1996, DCF had referred Lisa to Northeast Clinical Specialists for sexual offender treatment. Ms. Zuccaro, a sexual abuse therapist employed there, testified that Lisa did not acknowledge her participation in any abuse, and after a short period of time, she was discharged. She attended again in January of 1997 and was discharged in April for her failure to attend. During her first two attempts to involve herself in the treatment, Ms. Zucarro stated that Lisa was disruptive, needy in terms of seeking attention, and was hard to keep focused on the task at hand. Nonetheless, Lisa has again returned to treatment since she was released from York and has begun to participate in the group sessions there. She has also begun to admit the sexual abuse of her children, both in treatment and to her probation officer.
The prognosis for Lisa's ultimate rehabilitation remains very guarded. Ms. Zucarro stated that Lisa still has difficulty setting limits and controlling her impulses. At this point in time, she is still at high risk of offending again, Ms. Zucarro stated, without some type of on-going monitoring. She stated that, in her opinion, Lisa required more treatment than the group sessions the Clinic provides, because she has significant social service problems and psychological problems that need to be addressed. Lisa will need years of treatment before she will be someone who presents a low risk of offending again. In Ms. Zucarro's opinion, treatment will be required for at least five years.
Lisa's probation officer, Natalie Travers, testified concerning Lisa's behavior since her release from incarceration. At the present time, Lisa is monitored closely. For the first six months after her release, she resided in a half-way house where she had an apartment. While there, she reported to probation that watching cartoons on TV excited her. She was told to stop watching TV. More ominously, she became obsessed with a bank teller at a local bank and repeatedly went to the bank. Ms. Travers testified that Lisa became upset when the teller was not there, when she was there, she would become flirtatious with the teller. She stated on some occasions she wore shorts with no pockets and would reach inside her shorts to remove her wallet to carry out the banking transaction in a suggestive manner. Lisa would then go home and masturbate to fantasies about the teller. Because of Lisa's behavior, the bank became concerned and banned her from the premises and asked her to take her business elsewhere. CT Page 13597
Dr. Ronald Anderson of Northeast Clinical Associates testified. He had prepared a court-ordered psychological evaluation in connection with the criminal court proceedings in 1996 and now in 1998, in connection with the present petitions. In his opinion, he felt that Lisa had made progress since his first evaluation. He saw somewhat more insight on her part and a more realistic approach to her situation. He also thought that the structured setting while she was incarcerated may have contributed to her progress, as Lisa experiences much difficulty caring for her ordinary daily needs. He described the five stages necessary for the return of any sex offender to the general population. The first stage of treatment is to acknowledge her behavior and the damage done to others. The second stage is to account for it and to understand it in terms of the persons situation and the persons overall life context, such as past abuse that the offender may have experienced. The third stage is to understand the impact on the victim generally and then specifically. The fourth stage is to understand and appreciate when the offender might be at risk of losing their impulse control in the future and to learn and take effective coping steps. The fifth step is to look for some stable change and how the offender is interacting with others in treatment and in the community. The process is time-consuming and requires considerable motivation on the part of the offender. In Lisa's case, an additional complicating factor is her neuro-cognitive impairment which requires extra repetition for her to retain and organize information. He stated that "given her psychiatric history and her learning disability, it will be that much harder for her to accomplish things. It is likely to take quite some time before she is able to stop, although her motivation and willingness to respond and having an interest helps quite a bit." Because he was not involved with her group treatment, her present situation, he stated, would be best described by her counselor, Ms. Zuccaro, who was far less sanguine about her prognosis than was Dr. Anderson.
 B. ADJUDICATION
The court finds, by clear and convincing evidence, that as of February 2, 1998, based on Lisa's molestation of her children that both Alicia and Justin have been denied, by reason of acts of parental omission as well as commission, the care, guidance or control necessary for her physical, educational, moral and emotional well being as set forth in Connecticut General Statutes CT Page 13598 § 17a-112(c)(3)(C). The court concludes, from the evidence, that Lisa did sexually abuse both children. The full and ongoing extent of the permanent emotional harm inflicted on these vulnerable children by her behavior cannot be denied. In Re KellyS., 29 Conn. App. 600, 614, 616 A.2d 1161 (1992), In Re SeanH., 24 Conn. App. 135, 144-145, 586 A.2d 1171, cert. denied,218 Conn. 904, 588 A.2d 1078 (1991). The court further finds such circumstances had existed for an extended period of time in excess of one year prior to the date of the filing of the petitions for termination of parental rights.
The court further finds, by clear and convincing evidence, that as of February 2, 1998, 1997, Lisa R. had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112(c)(3)(B). Lisa is making some progress in her treatment, but will not for many years be able to function in society without being at risk. She continues to have sexual arousal around children and is, from the testimony of her probation officer, only barely able to cope with the normal pressures of living on her own. Her former therapist from Lawrence and Memorial Hospital testified that he believed Lisa would do best in a residential setting, with supports she does not now have. There is no question that Lisa cannot parent children, and in particular these children, who have special needs because of the abuse she inflicted on them. These children cannot wait until some future and indeterminate time for the rehabilitation of their mother, a rehabilitation she has never been able to achieve in the past and will not, if ever, achieve for years to come.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M. 6 Conn. App. 194,203, 504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). There is no doubt that Lisa will not be rehabilitated within the foreseeable future. The court finds, based on the clear and convincing evidence, this ground had existed for longer than one year prior to the filing of the termination petitions.
As to the putative father of Alicia, William M., the court finds from the clear and convincing evidence, that he has never CT Page 13599 been involved in Alicia's life, has never inquired about her, sent cards or gifts or in any way exhibited any interest in this child. He has abandoned her. Abandonment focuses on the parent's conduct. In Re Michael M., 29 Conn. App. 112, 614 A.2d 832
(1992); In Re Rayna M., 13 Conn. App. 23, 36, 534 A.2d 897
(1987); In Re Kezia M., 33 Conn. App. 12, 632 A.2d 1122 (1993). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In Re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). William M. has never been involved with the family, has not pursued visitation with Alicia, has not displayed love, affection or concern for her and has abandoned her completely. This ground has existed for Alicia's entire life.
 C. REQUIRED FINDINGS
The court makes the following factual findings about Lisa R. as to both children and about William M. as to Alicia, based upon the clear and convincing evidence required by Connecticut General Statutes § 17a-112(e):
1) Appropriate and timely services were provided by DCF to the family. Those services include services to benefit the children, counseling for them, parent aide program, Madonna Place for parenting classes, sexual offender group counseling, Reliance House, in-patient and out-patient services at Lawrence Memorial Hospital as well as individual counseling for Lisa. No services were offered to William M. as his identity and location were unknown until recently.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. Once the nature of the severe sexual abuse was known, the steps centered around the protection of the children. DCF did provide referrals to Lisa to help her with her sexual abuse issues. Unfortunately, she has not been able to successfully deal with her sexual abuse problems and remains at high risk for relapse. No efforts were made for William M., due to his unavailability.
3) DCF set reasonable and realistic goals for this family. Once the severe nature of the sexual abuse was known, there was no further contact between her and the children, based on the CT Page 13600 criminal court orders. There were no court-ordered expectations set for William M.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the child has developed significant emotional ties. Alicia has made her position known to the court directly. She wishes to remain with her foster parents and does Justin. Neither wish to see their mother and the overwhelming abuse they suffered continues to be very much on their minds. Both sets of foster parents wish to adopt these children, if possible.
5) Finding regarding the ages of the children. Alicia is now twelve and one-half years old and Justin is eight and one-half years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parent has maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. Lisa has been unable to adjust her circumstances to make return of the children to her feasible. William M. has never been involved with them.
7) Finding regarding the prevention of the parents from having a meaningful relationship, etc. No inappropriate conduct is noted. DCF took the necessary steps to protect these children when the sexual abuse disclosures were made.
 D. DISPOSITION
Alicia has been in the care of her foster parents over three years. Justin, too, has been in foster care for this long, but a shorter time in his present placement. In the three years Alicia has been in foster care, the stability and consistency, which have been provided by her loving relationship with her foster family and the stable home into which she has been welcomed, have sustained her. Justin, too, has begun to recover and grow in his CT Page 13601 placement. The court finds, based on the clear and convincing evidence, that it is in the best interests of both children to terminate their parents' rights to them. These findings are made after considering the special needs of these children and their demonstrated need for a secure and permanent environment. The court acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal(84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL.,BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979).
Based upon the foregoing findings, the court orders that a termination of parental rights enter with respect to Lisa A. as to Alicia and Justin and with respect to William M., as to Alicia. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. If the present foster parents continue to be willing to adopt the children, the court directs that they receive first consideration. The court further orders that a permanency plan for Alicia and Justin be submitted within ninety days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session
[2] Testimony of Dr. Ronald Anderson, psychiatric evaluator of Lisa R. in 1996 and in 1998.
[3] Child's Exhibit A, dated November 2, 1998.